BRUCE PROVENCE, Plaintiff-Appellee, v. ELVIS DOOLIN et al., Defendants-Appellants.

Fifth District    No. 79-148

Opinion filed November 26, 1980.

John W. Leskera and William L. Berry, both of Dunham, Bowman & Leskera, of East St. Louis, for appellants.

James F. Thebeau, Jr., of Granite City, for appellee.

Mr. JUSTICE KARNS delivered the opinion of the court:

The defendants, who variously owned, leased, and operated the Tri-City Speedway and the automobile races held there, appeal from the judgment of the Circuit Court of Madison County awarding the plaintiff, Bruce Provence, damages for personal injuries incurred when he was struck by a race car. The defendants contend, among other things, that the plaintiff was contributorily negligent, assumed the risk of injury, and was bound by a release he executed discharging the defendants from any liability.

Tri-City Speedway is located in Granite City. It consists of two oval dirt tracks, a quarter mile track enclosed within a half-mile track.

Evidence at trial established that the front straightaway of the quarter-mile track was immediately inside of the front straightaway of the half-mile track. A grandstand faced the outside edge of the front straightaway of the half-mile track. Light poles were placed at roughly equal intervals around the inside perimeters of the two tracks. Dirt mounds about 5 or 6 feet high and 12 or 15 feet across at their bottoms surrounded the bases of these poles. The larger track was partially surrounded on the outside edge by a guardrail. There were no guardrails on the quarter mile track except for a rail about 25 feet long in front of the judges' stand, located on the inside edge of the front straightaway.

Two types of stock cars raced at Tri-City during 1973, at the time of the incident involved. "Hobby" or "sportsmen" cars, which raced on the quarter mile track, were prepared from vehicles manufactured from 1950 through 1966. The maximum amount permitted to be expended in preparing these cars was $300. The "late model" cars, which raced on the half-mile track, were vehicles manufactured from 1967 through 1973 with no limit on expenditures for preparation. The hobby cars were generally driven by less experienced or novice drivers.

The races on both tracks ran counterclockwise. The first turn was at the end of the front straightaway, in the northwest corner of the track. The second turn was at the beginning of the back "straight," as the straightaway area was denominated, in the southwest corner. The third turn was at the end of the back straight in the southeast corner. The fourth turn was at the northeast corner at the beginning of the front straight.

Upon entering the track prior to racing, tow vehicles, race cars, and trailers, if used, were parked across the center of the infield of the quarter-mile track. This was referred to as the "pit area." The late model

cars generally parked next to one another in line facing the grandstand. Behind these were parked the hobby cars and tow vehicles. A surveyor's map indicated that the infield of the quarter mile track was 253 feet wide (the distance from the inside of the front straight across the infield to the inside of the back straight).

The tracks were watered prior to racing to keep down the dust. The cars would then run "hot laps" to pack the surface and prepare it for racing. The hobby cars on the quarter-mile track reached speeds of about 50 miles per hour.

Plaintiff was 25 years old at the time of his injury, on July 27, 1973. He had helped Terry Spaulding, who was 17, prepare a hobby car for the 1973 season. Spaulding drove the car, and plaintiff served as pit crewman during the race. The 1973 season was the plaintiff's first as a participant.

The plaintiff testified that upon arrival at the track gate, the participants would get out of the tow car, "sign the paper" (a form stating that the persons signing it released the defendants from any liability for injury in consideration of being permitted to enter), pay a $3 admission fee, and drive to the pit area. Al Krshul and another individual were the officials at the gate. There would often be a line of cars at the gate, with everyone in a rush to get in and the officials trying to get everybody through. The plaintiff thought that on his first night as a participant, he had had a conversation, apparently with an official, concerning the release form.

Plaintiff described the explanation he received as follows:

"* * * everybody that is present at the races has to sign this release, so that they can prove that you were present at the race-track, if something would happen to you, an injury of any kind, so that their insurance would cover it. If you didn't sign this, you wouldn't be covered."

The plaintiff stated that he did not read the form because it had been explained to him. Neither he nor anyone else was given a copy of the form.

Plaintiff further testified that during the races pit crew members gave hand signals to their drivers to indicate the distance between the driver and a car in pursuit or to indicate whether it was better to run closer to the inside or outside edge of the track. On the quarter-mile track, the pit men customarily stood along the inside of the back straight to give signals. He normally stood next to a light pole mound to give signals and remained there for the entire race.

On the night of the accident, six or eight races had been run prior to intermission. Plaintiff testified that it rained during the intermission prior to the sportmen's feature event in which he was injured. It did not rain during this race, but the track appeared slick. Plaintiff stood next to a dirt mound near the third turn at the end of the back straight. Prior to the

incident in which he was injured there was an accident or spin out, and the race was stopped for several minutes. At this time, he went out to where Terry Spaulding had stopped the car on the track and tried to wipe some mud off the windshield.

He testified that after the race began again, he moved away from the dirt mound to get a view of the second turn where the cars were having some difficulty handling because of the condition of the track. He testified that he walked away from the mound and proceeded to the northwest, away from the third turn. He intended to see if there was an area where Spaulding might be able to handle the car better as he came off the second turn.

Plaintiff described his actions immediately before his injury as follows:

> "Well, I was just walking back, looking in the general direction of the second turn, and I hadn't located Terry's car, so I didn't—didn't really know where he was, and then something just caught my attention, and I turned around, and the car that struck me was coming at me—toward me."

He tried to run but the car struck him and dragged him underneath, seriously injuring him. He estimated that he was about halfway between the edge of the track and the cars parked in the pit area of the infield when he was struck.

On cross-examination, plaintiff testified that he had participated in races at Tri-City Speedway on about 12 occasions prior to the date of his injury. He recognized that the sport was hazardous, especially to participants. Numerous times before the night of the accident he had seen cars lose control and go off the track to the outside or into the infield before they regained control. He knew that generally the hobby car drivers did not have much experience and that Terry Spaulding was a novice driver.

For the driver to see his signals, plaintiff had to lean toward the track from his position next to the mound. The edge of the mound reached almost to the inside edge of the track. In leaning to give signals, he was about 4 feet from the track.

He admitted that in taking his position next to the mound, he had considered the possibility that a car might very well leave the track and come into the infield at a high rate of speed. He was attempting to gain some measure of protection by standing near the mound, but he realized that he was in a hazardous position. He had heard announcements on the track's public address system instructing participants to stay off the mounds. He understood these announcements to mean that the track operators just did not want anyone near the edge of the track. Plaintiff also acknowledged that in walking away from his mound he had been in

an even more exposed position than next to the mound. Although plaintiff was looking in the general direction of the collision between the cars of Terry Spaulding and Dennis Colletti that resulted in Colletti's car going out of control and striking plaintiff, he did not recall seeing this collision. Finally, he acknowledged that his participation was entirely voluntary and that he had been aware that the track was slippery before the race started.

Wilbur Spaulding, Terry Spaulding's father and a racing driver of long experience, testified on plaintiff's behalf. He was driving a late model car on the night of plaintiff's injury. He testified that during the "hot laps" prior to racing it began to sprinkle lightly. The cars were throwing loose track surface onto the windshield of his car, and he pulled off the track before the hot laps were completed. It "sprinkled" again "rather heavily" prior to the sportsmen's feature race in which plaintiff was injured. However, he did not recall it raining during this event. After it, a downpour occurred, and the late model feature was cancelled.

Wilbur Spaulding remembered seeing his son running on the track. He stated that the track was "snotty," *i.e.*, very slick, and that Terry's car was "very loose." He discussed the condition of the track with Bob Mueller, apparently prior to the plaintiff's injury. Mueller was the official with the final decision on whether to cancel racing. Spaulding testified that he suggested that racing be terminated. However, the sportsmen's feature was allowed to run. Mueller later testified that he talked to Spaulding during the intermission prior to the sportsmen's feature, but that Spaulding had merely looked up at the sky and suggested that they had better get the races going. Mueller said that it was not raining at the time and that Spaulding had made no reference to the condition of the track. Spaulding stated that he left the decision of whether to race to Terry's discretion; however, if he had been concerned about his son being badly hurt, he would not have let him start the race.

Wilbur Spaulding further testified that he did not observe the plaintiff being injured. However, he did see his son's collision with Colletti in the second turn. At the time, he was standing on one of his vehicles in the pit area. He did not recall the race being stopped prior to the plaintiff's injury. He estimated that the distance from where the cars were parked in the pit area to the closest edge of the track was 60 or 70 feet. Colletti's car stopped 15 or 20 feet from the pit area and had not presented a danger to anyone in the pit area. Spaulding felt that events like his son's collision with Colletti and Colletti's car coming into the infield were to be expected.

Spaulding had observed that some racetracks had protection for persons in the infield and some did not. Within the last 10 years, he had

observed that some tracks had started to erect guardrails to protect the infield where the cars were pitted. He was of the opinion that there were not adequate safeguards on the infield of the Tri-City Speedway on the date of plaintiff's injury because there was not a guardrail on the infield. The track would have been safer with an inside guardrail. However, he acknowledged that it was not uncommon to see a car enter the infield and regain control, and that it would be hazardous if a car instead hit an inside guardrail and rebounded into the path of other cars. He also testified concerning a photograph of Highland Racetrack, which presented an example of a track where cars were pitted on the outside of the track.

Hand signals were customarily given in the infield reasonably close to the racetrack so that the driver would be able to see them, although being at the edge of the track during the race was hazardous. Spaulding testified that signals were not given from the top of the mounds because this would have been too high a location for the driver to see. However, he explained that announcements were made to stay off the mounds, because the participants would get on the mounds at times to give signals.

Wilbur Spaulding's understanding of the release form was that it stated "* * * that you are there, so you personally sign it for your insurance, you know, so in case—so that they know that it's you, that you've signed in and paid to get in that night." This was an understanding he had gained over the years in which he participated in racing. He had never been informed of any other purpose or given a copy of this type of form. Participants signed at the gate, with numerous others clamoring to get in.

Terry Spaulding testified that the pitmen normally gave signals while stationed along the back, or sometimes the front, straightaways. None gave signals from the pit area, because the drivers could not have seen them there. The plaintiff took his position near the dirt mound in the third turn to give signals according to Terry's instructions.

There were 15 laps in the race during which plaintiff was injured. It started raining before or during the intermission. The track became very slippery after it rained. The race was stopped prior to plaintiff's injury. After it began again, Terry lost control in the second turn and ran into Colletti. Terry spun sideways and drove up onto a dirt mound in the second turn. He did not see plaintiff at this time. Colletti's car went into the infield. Terry drove through the infield between Colletti's car and the pit area and got back on the track. He did not find out about the plaintiff's injury until he drove around to the front straight, saw a red flag, and stopped. He did not know whether the plaintiff moved away from the mound near the third turn before being hit.

Terry Spaulding testified that the reason for signing the release form was to get insurance coverage for injury.

Defendant Elvis Doolin testified under section 60 examination. He had owned the Tri-City Speedway since 1968. He had leased the track on behalf of Tri-City Speedway, Inc., to Edward Bloom on behalf of Speedway Promotions, Inc. He was concerned with maintenance of the physical plant rather than the conduct of the racing activities. However, he noted that if a race was rained out, money did not have to be returned to the spectators.

Doolin, after discussing the matter with Bloom, erected the 5-foot guardrail in front of the judge's stand in the spring of 1973. However, prior to the plaintiff's injury, he and Bloom never discussed placing guardrails anywhere else around the infield. He had seen pit men giving signals at the edge of the track and was aware the cars left the track and entered the infield.

Defendant Edward Bloom testified under section 60 that he leased the track to promote the races there. He entered into an agreement with the Central Auto Racing Association to provide officials and run the races.

He was in the grandstand office counting receipts at the time of the accident and did not see it occur. Defense counsel objected on hearsay and relevancy grounds when plaintiff's counsel asked if Bloom later found out that the plaintiff was injured while running to the assistance of Terry Spaulding. The court sustained the objection. Nevertheless, plaintiff's counsel proceeded to ask if Bob Mueller, president of the Central Auto Racing Association, had told Bloom later in the evening that the plaintiff was hurt while running to the assistance of Terry Spaulding. Bloom answered that he believed Robin Lowery, an official, had told him that. Plaintiff's counsel read from Bloom's deposition in which he had stated that Bob Mueller told him that the plaintiff was on a dirt mound, the car he was pitting for pulled into the pit area, and plaintiff was running after the car and got struck from behind, by another car. Bloom then testified that both Mueller and Lowery had told him this.

Bloom also testified that the grandstand was open, and the spectators would have left if it had rained. He saw no one leave until the time of the downpour after the race in which the plaintiff was injured.

Robert Mueller was also called by plaintiff to testify under section 60. The Central Auto Racing Association, of which he had been elected president in 1965, was a group of drivers who appointed officers to represent them at the track. He had extensive experience as a racing driver. At Tri-City, he was director of racing, in charge of the various officials.

He testified that he did not see the accident in which the plaintiff was injured. He was on the judge's stand at the time, looking at a different part of the track. He did not remember it raining before the plaintiff's injury.

As a driver, he was of the opinion that signals were unnecessary and

confusing in short races. However, signalling was a fairly frequent practice on the quarter-mile track. Collisions were more frequent in hobby car races than in the late model races.

Bruce Donaldson, plaintiff's final witness, testified that he was the pit man for Dennis Colletti during the race in question. Most pitmen signalled their drivers during the races. He customarily stood rather close to the back straight and at times had stood within 5 or 10 feet of the track. He had heard the announcement telling pitmen to stay away from the edge of the track.

Prior to the hobby feature, it rained. The race was stopped because of an accident prior to the plaintiff's injury. After the race resumed, he saw a car strike Colletti's in the turn. Colletti lost control, travelled over a dirt mound and went airborne, and landed on top of the plaintiff. Donaldson estimated that the plaintiff was 20 to 30 feet from the edge of the track when he was struck. When Donaldson first saw him, the plaintiff was running northwest, and Colletti's car was already heading for him.

Stewart Reamer testified for the defendants. He was a racing official, announcer, and publicity man. He had built three hobby cars but had not raced in actual competition and was not present at the event involved in this case.

He gave his opinion that drivers would prefer not to have an inside rail because contact with any guardrail damages the cars. There was a likelihood of stalling against the rail after a collision and getting caught directly in the "fast groove" which is on the inside of the turns. Also, with an inside rail there was a possibility of rebounding off the rail onto the track in the path of other cars, instead of entering the infield and regaining control. He acknowledged that he had seen tracks with various types of safety devices in the infield such as guardrails, walls, and mounds.

Freeman Miller was a member of the ambulance crew that removed the plaintiff from the track. He was stationed in the pit area and testified that he saw the accident. It did not rain before the accident. He first saw the plaintiff moments before the two cars collided. Plaintiff was on top of a dirt mound near the beginning of the third turn. The two cars collided about half way down the back straight. The plaintiff was looking at the cars and waving his arm just before they collided. When the plaintiff saw one of the cars coming toward the mound, he began to run. He reached the edge of the mound before the car hit him. He was lying at the edge of the mound when Miller arrived with the ambulance.

Thomas Stauffer was pit steward, in charge of lining up the cars for the races and generally overseeing activities in the infield area. He testified that it did not rain until after the event in question. About 25 or 30 racing cars were in the pits that evening. He did not see the accident.

It was his job to see that pit crew members did not go out to the edge

of the track. The participants had been told about this at drivers' meetings. He and other officials instructed pit men who got too close to the track to return to the pit area. However, he did not know of anyone being fined or removed from the track for getting too close to the track. Pitmen usually positioned themselves behind a dirt mound on the back straight to give signals. This was a relatively safe place to do this.

Robin Lowery was an official stationed near the fourth turn during the race in which the plaintiff was injured. He was observing the third turn, the back stretch, and the cars coming out of the second turn. If he saw a mishap on the track, he would signal the starter to throw the caution flag.

Lowery testified that seconds before the accident, he saw the plaintiff standing on top of a mound near the third turn. Colletti's car and another car either collided or came very close to doing so. Colletti lost control, left the track, and headed into the area between the rear straightaways of the quarter-mile and half-mile tracks. As he was fighting to regain control, his car cut back across the quarter-mile track near the third turn toward the dirt mound where the plaintiff was standing.

Lowery testified that at this point he was saying to himself with reference to the plaintiff, "move, move, move." But the plaintiff was standing on the mound facing toward the first turn. When the car hit the mound the plaintiff started moving, but the car swung around and hit him.

Al Krshul testified that he worked at the pit gate. The participants paid admission, signed the release, and entered. When a person asked what he was signing, Krshul would tell him that he was signing a release, which released the track from responsibility in case of injury. He had never read the release form, although he noted that the words "THIS IS A RELEASE" appeared on each signature line. If other participants were waiting, he would give the person at the gate a blank form and let them go to one side to read it if they wished. On cross examination, plaintiff's counsel impeached Krshul with statements from his deposition that he had told participants that the release form proved they were in the pits and that he did not remember telling them anything else about it.

Portions of Dennis Colletti's deposition were read at trial. He did not see the plaintiff prior to the accident and did not know where he was standing. Coming out of the second turn, another driver collided with Colletti's car. He spun and ran up onto a dirt mound going into the third turn. The rear passenger side of his car hit the pole, and he spun around and landed on top of the plaintiff. He estimated that his car stopped about 20 or 30 feet from the edge of the track. It had just started to rain prior to this race. There had been a collision in the race prior to the one involving his car.

Portions of Russell Wallace's deposition were also read at trial. He

was at the track as a participant on the evening of the occurrence. It did not rain prior to the plaintiff's injury. The track was in normal condition. The racing director had warned pitmen to remain in the pit area away from the edge of the track. Wallace agreed with this policy. He did not see the accident itself, but immediately after it occurred, he saw the car on a dirt mound with the plaintiff underneath it. On cross-examination, he indicated that he did not like the plaintiff bringing this action. He stated, "* * * it raises entry fees, because somebody has to pay for the insurance." This testimony was objected to by defense counsel at the time of the deposition, but was included in the portion read to the jury.

■■ The defendants contend that, as a matter of law, the plaintiff was contributorily negligent and assumed the risk of injury. A person who fails to exercise ordinary care for his own safety is contributorily negligent and cannot recover from another for an injury proximately caused by his lack of care. (*Francis v. Francis* (1973), 9 Ill. App. 3d 90, 291 N.E.2d 859.) The defense of assumption of risk requires a showing that the plaintiff voluntarily incurred a risk known to him which caused his injury. Prosser, Torts §68, at 447 (4th ed. 1971).

■■ In Illinois, the defense of assumption of risk is confined to situations where the parties have a contractual or employment relationship contemplating activities normally accompanied by the danger that causes the injury. (*Barrett v. Fritz* (1969), 42 Ill. 2d 529, 248 N.E.2d 111; see IPI Civil No. 13.01.) For example, a golfer whose ball strikes another may not assert assumption of risk in a lawsuit brought by the injured golfer; although, *Barrett* recognized that the golf course might assert the defense because of its "contractual relationship" with the injured golfer.

■■ Thus, the payment of a fee for entry upon recreational premises, such as the admission fee paid by the plaintiff here, would appear to create a contractual relationship within the meaning of Illinois law concerning assumption of risk. (See also *Murphy v. White City Amusement Co.* (1926), 242 Ill. App. 56, and *Russo v. The Range, Inc.* (1979), 76 Ill. App. 3d 236, 395 N.E.2d 10.)

Unlike contributory negligence, which may consist of a person's failure to use ordinary care to discover a danger, assumption of risk is said to depend on consent to encounter a danger actually comprehended:

> "The standard to be applied is, in theory at least, a subjective one, geared to the particular plaintiff and his situation, rather than that of the reasonable man of ordinary prudence who appears in contributory negligence. If because of age or lack of information or experience, he does not comprehend the risk involved in a known situation, he will not be taken to consent to assume it." Prosser, Torts §68, at 447-48 (4th ed. 1971).

The application of this subjective test in determining assumption of risk is illustrated in two cases. In *Russo v. The Range, Inc.*, summary judgment for the defendant amusement park was reversed where the record did not disclose that the plaintiff knew the risks of using a large slide in the park. *Russo* distinguished *Murphy v. White City Amusement Co.*, where a directed verdict for the defendant on the ground of assumption of risk was supported by the plaintiff's testimony that she knew the dangers of riding down a steep incline in a boat that bounced violently when it struck the water at the bottom.

Notwithstanding the theoretical differences between contributory negligence and assumption of risk, courts frequently treat the question of voluntary exposure to a known risk as bearing upon the question of contributory negligence. (*Hargis v. Standard Oil Co. of Indiana* (1956), 10 Ill. App. 2d 119, 134 N.E.2d 518.) That is, the plaintiff's conduct in encountering a known risk may be in itself unreasonable:

> "In such cases it is clear that the defenses of assumption of risk and contributory negligence overlap, and are as intersecting circles, with a considerable area in common, where neither excludes the possibility of the other." Prosser, Torts §68, at 441 (4th ed. 1971).

In this case, it is undisputed that the hobby cars commonly entered the infield area after colliding or otherwise losing control. Just as the drivers were not deterred from participating by the danger of being injured in a crash, the pit crew members who chose to station themselves near the track to give signals accepted the obvious risk of being struck by a car.

The plaintiff testified to his awareness and voluntary acceptance of this risk. He had often seen cars enter the infield out of control at a high rate of speed, and he considered this danger in taking his position near the mound. He understood that the purpose of the warnings over the public address system was to keep participants away from the edge of the track. He knew that he was in a hazardous position near the track, even with whatever relative degree of protection the mound offered. His participation in the races was entirely voluntary, including his agreement to give the signals to Terry Spaulding from a position of obvious danger. He also knew that the track was slippery even before the race in question started.

■■ Even assuming *arguendo* that the evidence presented a jury question of the defendant's alleged negligence in failing to provide adequate safeguards for participants in the infield and failing to cancel the race in question, we hold that the evidence conclusively establishes assumption of risk and contributory negligence as a matter of law. The trial court should have directed a verdict for the defendants because all of the evidence, when viewed in its aspect most favorable to the plaintiff, so

overwhelmingly favored the defendants that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

While we are aware of no Illinois case directly on point, courts in other States have reached similar conclusions. *Shula v. Warren* (1959), 395 Pa. 428, 150 A.2d 341, affirmed a judgment *n.o.v.* in favor of racetrack operators in a case where a plaintiff familiar with the hazards of auto racing entered the unprotected infield of a quarter-mile dirt track and proceeded to a point near the edge of the track, thereby assuming the risk of the injury he sustained when a car spun and skidded in a turn and entered the infield and struck him. *Shula* noted that cases dealing with the adequacy of protection provided by a track operator in an area reserved for spectators were inapplicable to the situation of an injury in an area restricted to participants. Similarly, *Morton v. California Sports Car Club* (1958), 163 Cal. App. 2d 685, 329 P.2d 967, held that a spectator familiar with auto racing assumed the risk of injury as a matter of law by choosing to view a race from various vantage points around the track rather than from the grandstand and by taking a position 150 feet from the track opposite a turn having only a snow fence barrier, where he was injured by a wheel that came off a car, crashed through the fence, and struck him. *Morton* reversed the jury's verdict for the plaintiff-spectator. *Seymour v. New Bremen Speedway, Inc.* (1971), 31 Ohio App. 2d 141, 287 N.E.2d 111, reasoned that a race driver who knew the risks of collision, hitting a surrounding fence or wall, spinning, and the possibility of fire assumed the risk of these inherent dangers by simply entering the race.

The plain import of these decisions is that a person familiar with the obvious dangers of auto racing cannot recover for injuries resulting from either his choice to encounter these dangers by voluntarily participating with knowledge of the risks involved at a particular track or his choice to view a race from an exposed position. The plaintiff here voluntarily made both of these choices.

In the plaintiff's brief and in closing argument before the jury, counsel has persistently asserted that the plaintiff, at the time he was injured, "* * * was rushing to the assistance of Terry Spaulding * * *." It is argued that his exposure to the risk of being struck must be ascribed to this action, because he would have rushed to his driver's assistance and subjected himself to the same risk even if previously he had been standing in the pit area rather than at the edge of the track.

This argument rests entirely on the testimony of Edward Bloom, who did not see the accident. Bloom testified that he had been told by Robert Mueller and Robin Lowery that the plaintiff was struck from behind while running after the car he was pitting for. Bloom was allowed to so testify even though the court had previously sustained defense counsel's

objection to an earlier inquiry whether Bloom had discovered, following the accident, that the plaintiff had been running to the assistance of Terry Spaulding. Plaintiff contends that the statements of Mueller and Lowery, as testified to by Bloom, were admissions against interest by agents of a party-defendant, and thus excluded from the application of the hearsay rule under *Kapelski v. Alton & Southern R.R.* (1976), 36 Ill. App. 3d 37, 343 N.E.2d 207.

The plaintiff's theory might well be questioned as a basis for admission of Bloom's testimony for the truth of the matter purportedly asserted by Mueller and Lowery. However, we need not decide the scope or applicability in this case of the hearsay exception asserted because whatever value Bloom's testimony might have as evidence is completely insignificant considering the overwhelming evidence to the contrary, including plaintiff's own testimony.

The plaintiff testified that he did not see the collision between Terry Spaulding and Dennis Colletti, and that when he was struck he did not know where Spaulding's car was. Robert Mueller testified that he did not see the accident involving plaintiff. Robin Lowery testified that the plaintiff was standing on the mound and began to move only when Colletti's car hit the mound and that the car swung around and struck the plaintiff. Plaintiff's counsel did not attempt to impeach Mueller and Lowery with what they may have told Bloom.

*Pedrick* does not preclude direction of a verdict merely because there is some evidence to suggest a contrary result. All of the evidence, viewed in a light most favorable to the plaintiff, overwhelmingly established that he was injured because he chose to be near the edge of the track during the race.

Plaintiff also contends that he was duty bound to leave his position near the mound to observe the condition of the second turn and that he would not have done so and exposed himself to the danger of being struck had the defendants not allowed the race to continue. In reviewing this contention we resolve in the plaintiff's favor the conflicting evidence of whether it had rained prior to the race and whether the plaintiff in fact did leave the mound prior to being struck. However, the plaintiff testified that he was aware of the slippery condition of the track even before the race began and that by leaving the mound he became even more exposed to the danger of being struck.

While our decision is based on principles of assumption of risk and contributory negligence, we also note that the evidence presented a close question on whether the written release provided another ground for direction of the verdict. On this issue, plaintiff relies on *Moore v. Edmonds* (1943), 384 Ill. 535, 52 N.E.2d 216, and *Sexton v. Southwestern Auto Racing Association, Inc.* (1979), 75 Ill. App. 3d 338, 394 N.E.2d 49.

In *Moore v. Edmonds*, a plaintiff entering a toboggan slide facility wrote his signature, address, and phone number upon a card that contained in bold face type the words "Return This Receipt" as well as a sentence in small print stating that the plaintiff agreed to return all equipment in the same condition as received and that he released the defendants from liability for injury. *Moore* held that the jury's finding that the card was deceptive in appearance and itself constituted a misrepresentation was not against the manifest weight of the evidence.

In *Sexton v. Southwestern Auto Racing Association, Inc.* (1979), 75 Ill. App. 3d 338, 394 N.E.2d 49, we reversed a summary judgment for the defendant, where material facts were in dispute concerning the validity of a written release agreement, including whether the portion of the agreement containing the exculpatory language was covered by another paper when signed by the plaintiff.

Here the agreement was captioned in bold face capital letters, "WAIVER AND RELEASE FROM LIABILITY AND INDEMNITY AGREEMENT." The sole purpose of the agreement was to release the defendants, and plaintiff does not claim that any part of the agreement was covered when he signed it. On each signature line in capital letters were the words "THIS IS A RELEASE." The form and language of an agreement similar to this have been held to be so conspicuous that reasonable men could not reach different conclusions on the import and significance of the instrument where a person knowingly and willingly signed the document. *LaFrenz v. Lake County Fair Board* (1977), 172 Ind. App. 389, 360 N.E.2d 605.

Having determined that the plaintiff assumed the risk of injury and was contributorily negligent as a matter of law, we do not reach the various contentions of trial error raised by the defendants. The judgment of the Circuit Court of Madison County is reversed.

Reversed.

JONES, P. J., and SPOMER, J., concur.