**Domenico De SOLE, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee,**

**Chesapeake Bay Yacht Racing Association, United States Yacht Racing Union, Incorporated, Amici Curiae.**

No. 89–2471.

United States Court of Appeals, Fourth Circuit.

Argued April 2, 1990.

Decided Oct. 29, 1991.

As Amended Nov. 21, 1991.

---

Allan Abbott Tuttle, argued, Patton, Boggs & Blow, Washington, D.C., for plaintiff-appellant.

Stephen P. Kling, argued, Crummey & King, Annapolis, for amici curiae.

Kevin Patrick McMahon, Civ. Div., U.S. Dept. of Justice, Washington, D.C., argued (Stuart M. Gerson, Asst. Atty. Gen., Civ. Div., U.S. Dept. of Justice, Washington, D.C., Breckinridge L. Willcox, U.S. Atty., and Ethan L. Bauman, Asst. U.S. Atty., Baltimore, Md., on brief), for defendant-appellee.

Before WIDENER and MURNAGHAN, Circuit Judges, and SMITH, District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

MURNAGHAN, Circuit Judge:

Domenico De Sole filed an action in admiralty under the Suits in Admiralty Act, 46 U.S.C.App. § 741 et seq., and the Public Vessels Act, 46 U.S.C.App. § 781 et seq., seeking to recover for damages to his racing yacht, CIRO. The damages, allegedly $41,600.05 worth, were caused by a collision with the United States Navy yacht, CINNABAR, at the finish line of the Chesapeake Bay Yacht Racing Association's 1988 Spring Race, Event # 301 on April 23, 1988.

After De Sole filed his complaint, the Navy moved to dismiss under Federal Rule

of Civil Procedure 12(b)(6). The Navy maintained that the plaintiff, in entering the yacht race, had assumed the risk of collision and consequently had failed to state a claim upon which relief could be granted. After briefing, but without a hearing, the district court granted the Navy's motion. De Sole has appealed and we now remand.

We note that, although the dissent implies that the opinion attempts to negate the yacht racing world's alleged decision to forgo damages for race collisions, the *amici curiae*, the Chesapeake Bay Yacht Racing Association, Inc. ("CBYRA") and the United States Yacht Racing Union, Inc. ("USYRU"), have represented to the court that if the decision below is upheld their sport will be disrupted:

> [t]he court below, without any knowledge or understanding of the sport upon which it cavalierly passed judgment, and without any evidence upon which to make a reasoned assessment, issued a decision which, without exaggeration, carries real potential to rip the sport of sailboat racing asunder.

Brief of *Amicus Curiae* at 21. We have every hope that the dearth of information on sailing in the present record, which has resulted in a certain frustration, evidenced in footnotes throughout our opinion and the dissent, will be rectified upon a hearing on remand.

## I.

The court, in deciding a 12(b)(6) motion, must take all wellpleaded material allegations of the complaint as admitted and view them in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969). "[A] rule 12(b)(6) motion should be granted only in very limited circumstances." *Rogers v. Jefferson–Pilot Life Ins. Co.*, 883 F.2d 324, 235 (4th Cir. 1989). All of the specifics of the collision are from De Sole's complaint. We con-

front, in assumption of the risk, an affirmative defense. *See* W. Page Keeton, *Prosser and Keeton on the Law of Torts*, § 65, at 451 (5th ed. 1984 & Supp.1988). Hence, the district court's ruling on a 12(b)(6) motion for the defendant must have been one of law, of universal application and regardless of factual variation, that assumption of the risk was present and controlled.

The CINNABAR is owned by the United States and is used as a sailing training vessel at the United States Naval Academy's Robert Crown Sailing Center in Annapolis, Maryland. At the finish line of the race, the CINNABAR, crewed by midshipmen, struck the CIRO. At a protest hearing five days later, the Race Committee of the United States Naval Academy Sailing Squadron at the Robert Crown Sailing Center absolved CIRO of any fault in the collision and disqualified CINNABAR on the grounds that it had violated Rule 37.2 of the International Yacht Racing Rules ("IYRR"). That rule requires that a yacht clear astern keep clear of a yacht clear ahead. According to the complaint, the Navy sailing director relieved the master of the CINNABAR, a midshipman, for his negligent navigation of the CINNABAR.

In accordance with the apparent tradition that the losing party to a protest pays the damages, the Navy requested that De Sole have a marine surveyor appraise the damages. De Sole submitted the appraisal by marine surveyor to the Navy pursuant to federal regulations. However, the Navy subsequently refused to pay for the damages.[1]

## II.

In granting the 12(b)(6) motion, District Judge Norman P. Ramsey found controlling analogy in cases involving other sporting events such as a horse race. *See, e.g., Turcotte v. Fell*, 68 N.Y.2d 432, 502 N.E.2d 964, 510 N.Y.S.2d 49 (1986). The district court held that the assumption of risk doc-

---

1. De Sole submitted the claim to the Navy for damages under 32 C.F.R. Part 752 and 10 U.S.C. § 7622. The statute permits the Secretary of the Navy to settle or compromise and pay up to $1,000,000 for each claim against the United

States caused by a vessel in naval service. The regulations cover the procedures to be followed in settling those claims. On March 27, 1989, the Navy rejected the claims and De Sole filed his complaint.

trine applied as a bar to any recovery by De Sole. In doing so the judge also found persuasive a case involving property damage which occurred during a motorboat race on navigable waters, *Dunion v. Kaiser,* 124 F.Supp. 41 (E.D.Pa.1954). The *Dunion* case is the only case that either party, the *amici,* or we have found that has held that a sporting event in which admiralty jurisdiction is invoked triggers the assumption of risk doctrine.[2]

The government contends that assumption of risk does have a place in admiralty law. The government does concede that there is no assumption of risk defense available in the context of a seaman's injury. *Socony–Vacuum Oil Co. v. Smith,* 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939). Assumption of risk has been rejected as well in the context of a recreational boating accident involving personal injury. *Skidmore v. Grueninger,* 506 F.2d 716 (5th Cir.1975). The doctrine has been barred in admiralty cases involving commercial collisions, *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), as well as in a recent case involving faulty repairs to a private yacht. *Edward Leasing Corp. v. Uhlig & Assoc., Inc.,* 785 F.2d 877 (11th Cir.1986).

Nevertheless, the government distinguishes the above-discussed cases as well as numerous others by pointing out that those authorities involve personal injuries or property damage not in the context of a sailboat race. In addition to the lone *Dunion* opinion, the government has relied upon cases involving other sporting activities which have held that a participant assumes the risks of a sport that are obvious and foreseeable. *See Novak v. Lamar Ins. Co.,* 488 So.2d 739 (La.App.), *cert. denied,* 491 So.2d 23 (La.1986) (no liability imposed for injuries sustained by softball player where defendant did not act with a wanton or reckless lack of concern for others); *Kabella v. Bouschelle,* 100 N.M. 461, 672

P.2d 290 (N.M.Ct.App.1983) (football); *Kuehner v. Green,* 436 So.2d 78 (Fla.1983) (karate); *Huckaby v. Confederate Motor Speedway, Inc.,* 276 S.C. 629, 281 S.E.2d 223 (1981) (automobile racing).

Acknowledging that admiralty employs a system of comparative fault, the government nevertheless endeavors to show how the assumption of risk doctrine also can be reconciled with such a doctrine. Again, it illustrates that attempted reconciliation by referring to sports cases in comparative negligence jurisdictions. *See Gauvin v. Clark,* 404 Mass. 450, 537 N.E.2d 94 (1989) (hockey; no cause of action for mere negligence during sport, the duty of care owed by players is to refrain from willful, wanton and reckless conduct); *Ordway v. Superior Court,* 198 Cal.App.3d 98, 243 Cal. Rptr. 536 (1988) (horse racing; in action brought by jockey for injuries suffered in collision during a race, reasonable implied assumption of risk is a complete defense within California's comparative negligence system); *Hanson v. Kynast,* 38 Ohio App.3d 58, 526 N.E.2d 327 (1987) (lacrosse; notwithstanding comparative negligence scheme, in athletic competition there is no liability for actions which fall short of an intentional tort); *Turcotte v. Fell,* 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964 (1986) (horse racing; consent to risks inherent in the contest mitigates duty of jockey to refrain from carelessness or merely negligent violations of the rules and no cause of action therefore will be allowed, even under New York's comparative fault statute).

De Sole points out that, even assuming *arguendo* that sports law doctrines are applicable, the district court should still be reversed. He quotes the Restatement (Second) of Torts § 50 comment b (1969):

Taking part in a game manifests a willingness to submit to such bodily contacts or restrictions of liberty as are permitted

---

**2.** The *Dunion* case has been cited once in the thirty-six years since it was written and then not in support of the citing court's ultimate holding that damages in admiralty cases must be divided in proportion to the respective fault of the parties. *See Complaint of Paducah Towing Co., Inc.,* 692 F.2d 412, 423 n. 22 (6th Cir.1982). We

note that *Dunion* is an unappealed district court decision. The admiralty authorities that the *Dunion* court relied upon, cases involving collisions between commercial vessels, have long since been overruled by the Supreme Court in *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

by its rules or usages. Participating in such a game does not manifest consent to contacts which are prohibited by rules or usages of the game if such rules or usages are designed to protect the participants and not merely to secure the better playing of the game as a test of skill.

Because the Navy's own Race Committee has found the Navy's yacht to have violated during the race a well-known rule of universal application, De Sole argues that a strong case of negligence *per se* is made out on the part of the violator. De Sole cannot be said to have consented to a contact clearly prohibited by the rule, which does not cease to apply in a sailboat race. The rule manifestly concerns participant protection and is not concerned with increased sports proficiency.

De Sole further points out that the sports cases cited by the district court concern sports which "by [their] own nature, [are] sports posing great peril to its participants." *Santiago v. Clark,* 444 F.Supp. 1077, 1079 (N.D.W.Va.1978) (horse racing).[3] De Sole distinguishes sailboat racing as a sport not generally considered a contact sport but rather one in which physical damage results almost exclusively from a breach of safety rules.[4] Both De Sole and *amici* urge that, even if the assumption of risk doctrine is found to apply, we must remand to determine (1) the practices and traditions of the sport, (2) the expectations of the participants, (3) what the inherent risks of sailboat racing are, and, ultimately, (4) whether the risk of the injury occurring here was assumed by De Sole. We agree.

### III.

■ We decline to hold that assumption of risk applies to the facts as presented, at least at the 12(b)(6) stage, by the record. Our distinguished colleague, Judge H. Emory Widener, impatient at waiting for a fleshed out record, has dissented, concluding that the facts, on more detailed examination, could not remove the case from the application of the assumption of risk doctrine. And even if some aspects of assumption of the risk to a yachting race do apply, there still remains for resolution whether the clear ahead rule is waived or otherwise abated automatically because of participation in the race. Failure to clarify that point would, however, lead us to pass over, in a case combining essential novelty of doctrine and apparent widespread breaking with past practice,[5] a requirement of adherence to the salutary approach of not deciding more than absolutely necessary in an individual case.

*Amici* assert that there is a long-standing tradition in sailboat racing that the party at fault in a collision bears the responsibility for the damages caused. As there are no cases cited by anyone involving a dispute over damages in a sailboat race, an inference arises that that tradition does appear to exist. We note, however, that the IYRR rules under which the race was held, specifically provide that:

> The question of damages arising from an infringement of any of the rules shall be governed by the prescriptions, if any, of the national authority.

Rule 76.1.

The national authority, the USYRU, made no prescription as to that rule. The contention may be made that the failure of the USYRU to provide that liability should

---

**3.** De Sole's argument contends that the sailing collision is not analogous, for example, to a perfectly proper and fully legitimate tackle in a football game. In such a case, what would otherwise be the tort of assault and battery may be excused and any injury not recoverable because of voluntary assumption of the risk, i.e., waiver of any claim on account of the injury, either because there was no tort or because it was forgiven in advance. De Sole stoutly denies any such prior abnegation of claims for collision injuries. At the 12(b)(6) stage we must accept his assertion.

**4.** The government counters with dry land sports cases in which a rules violation has not always been equated with civil liability. *See Ordway,* 243 Cal.Rptr. at 543.

**5.** At argument, counsel for the United States indicated that, in antecedent situations posing a similar problem, the Naval Academy's practice has been to pay for damages to the competing vessel.

be assigned to the violator makes inapplicable the drawing, as a legal resource, on the above-discussed tradition. Yet, by abdicating the need to fix liability, the USYRU did not affirmatively place the risk on the contestant suffering injury. The USYRU did no more than leave the general law of admiralty in effect, which thus by default becomes the prescriptions of the national authority.[6] The question remains to be investigated and decided by us.[7]

If, indeed, we are obliged to decide flat out whether assumption of risk applies to a yachting race on the high seas (and the Severn River and the adjoining Chesapeake Bay are clear examples of navigable waters), the majority would be disposed to hold that there is ordinarily no assumption of risk doctrine applicable to collisions between contestants in a maritime race of the nature here presented. A decision that the assumption of risk doctrine usually does not apply to race collisions in admiralty leaves open the possibility that, in certain circumstances, a court could find that a particular sailor had assumed the risk of collision. For example, a yacht club could require all racing participants in advance of the race to sign a statement that they would not sue for damages in negligence in the case of a collision, thereby assuming the risk.[8] But the possibility that some hypothetical sailor may assume the risk of collision does not justify a court-adopted blanket rule that all sailors in all racing circumstances be barred from suing in negligence for collision damages.

The rule granting absolute preference to the vessel ahead is universally well established and observed and is manifestly designed to avoid injury. It is not normally waived and was not waived here by participants in a sailing race as might be any claim for injury resulting from a legitimate tackle in a football match. The Naval Academy's punishment of the master of the CINNABAR and the Race Committee's placing the blame on CINNABAR by disqualifying it illustrate the difference. An injury following a proper tackle of football generates no such sanctions.

■ The tenets of admiralty law, which are expressly designed to promote uniformity, do not permit assumption of risk in cases of personal injury whether in commercial or recreational situations. Indeed, admiralty law has been credited as giving birth to the idea of comparative negligence. *See* H. Woods, *Comparative Fault,* § 1:10

---

**6.** The dissent implies that the repeal in 1969 of a USYRU rule specifically providing for the payment of damages requires the court to follow suit and not reimpose the repealed rule. But, the dissent itself provides a sensible explanation for the repeal which, if anything, emphasizes that courts are the rightful locations of litigation over yacht racing damages unless racing union authorities provide, in essence, for private resolution. The repealed rule appears to have been an IYRR rule, adopted by the USYRU. Where the old IYRR rule required the payment of damages, the new rule leaves the "question of damages" to "be governed by the prescriptions, if any, of the national authority." IYRR 76.1. According to the dissent, one national authority, the Royal Yachting Association ("RYA"), now prohibits the adjudication of claims for damages by racing committees. Instead, the RYA states that they are "subject to the jurisdiction of the Courts." The USYRU has not followed the RYA in expressly abandoning the traditional role of encouraging private determinations of liability. The absence of a USYRU rule on damages does not mean that the USYRU intended for damages to go uncompensated. Indeed, the *amici*, which include the USYRU, believes that "it is the tradition in sailboat racing that the party causing damage to another during a race assumes financial responsibility for the damage caused." Reply Brief of *Amici Curiae* at 7. The repealer means merely that the courts, in addition to the yacht associations, may handle disputes over damages. If the USYRU wants to prevent race participants from paying for collisions, it need only require participants to agree to waive damage recovery prior to entering any race. It clearly has not done so.

**7.** In fact, USYRU provisions would appear to relate exclusively to contractual liability and play no limiting part to a claim in tort. *See infra* footnote 11.

**8.** We note that the assumption of risk doctrine, as stated in *Prosser and Keaton on Torts, supra* at 486–87 is:

quite narrowly defined and restricted by two or three elements or requirements: first, the plaintiff must know that the risk is present and he must further understand its nature; and second, his choice to incur it must be free and voluntary. Since in the ordinary case there is no conclusive evidence against the plaintiff on these issues, they are normally for the [the fact finder] to decide.

at 19 (2d ed. 1987 & Supp.1990). Comparative negligence has become the preferred standard. "As of 1986, all but six states and the District of Columbia had switched to a comparative negligence standard." Cooter & Ulen, *An Economic Case for Comparative Negligence*, 61 N.Y.U.L.Rev. 1067, 1068 nn. 2–4 (1986). As of 1990, the vast majority of these states has either entirely abolished or merged assumption of risk with comparative negligence.[9] Only three states remain that have adopted comparative negligence and yet have specifically retained assumption of risk.[10] *See* H. Woods, *supra* at § 6:7 (Oklahoma, Rhode Island and West Virginia).

Contractual or express assumption of risk may survive in comparative negligence or fault jurisdictions. But state courts have struggled with whether "reasonable" implied assumption of risk of the sort urged by the dissent can be maintained. A recent California appellate case, now under consideration by the California Supreme Court, surveyed the debate. *See Harrold v. Rolling J Ranch*, 218 Cal.App.3d 36, 218 Cal.App.3d 841A, 228 Cal.App.3d 260, 266 Cal.Rptr. 734 (1990), *review granted and opinion superseded*, 269 Cal.Rptr. 720, 791 P.2d 290 (1990). The *Harrold* court noted that "eight other states ... have decided to retain primary assumption of risk following adoption of a comparative fault system." 228 Cal.App.3d at 269, 266 Cal.Rptr. at 740. Among these is New York in *Turcotte v. Fell*, 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964 (1986), upon which the dissent has relied. However, the *Harrold* court continued and explained, "the opposite view has been expressed persuasively by a number of leading commentators and has been adopted by the large majority of compara-

tive fault jurisdictions." 228 Cal.App.3d at 270, 266 Cal.Rptr. at 740. The court then quoted some of "the many vocal detractors of the continued viability of assumption of risk":

> "The doctrine of assumption of risk, however it is analyzed and defined, is in most of its aspects a defendant's doctrine that restricts liability and so cuts down the compensation of accident victims. It is a heritage of the extreme individualism of the early industrial revolution. But quite aside from questions of policy or of substance, the concept of assuming the risk is purely duplicative of other more widely understood concepts, such as scope of duty or contributory negligence.... Except for express assumption of risk, therefore, the term and the concept should be abolished. It adds nothing to the modern law except confusion...."

*Id.* (*quoting* 4 Harper, James & Gray, *Law of Torts* (2d ed. 1986) § 21.8, at 259–60) (footnotes omitted).

Moreover, our belief that the majority position should be followed is unopposed by the history of admiralty law. Maritime law has "always, in this country as in England, been a thing apart from the common law." *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 386, 90 S.Ct. 1772, 1780, 26 L.Ed.2d 339 (1970). And admiralty has been characterized by "humane and liberal proceedings." *Id.* at 387, 90 S.Ct. at 1781 (*quoting The Sea Gull*, 21 F.Cas. 909 (No. 12, 578) (C.C.Md.1865)); *see Miles v. Apex Marine Corp.*, — U.S. —, 111 S.Ct. 317, 327, 112 L.Ed.2d 275 (1990). Admiralty has not recognized assumption of risk in a situation similar to the present one. We recall the words of Justice Harlan F. Stone in

---

**9.** Alaska, Colorado, Hawaii, Idaho, Kansas, Kentucky, Michigan, New Hampshire, New Mexico, New Jersey, and Wyoming by court decisions abolished or merged assumption of risk before adopting comparative fault. *See* H. Woods, *supra* at § 6:2. Connecticut, Massachusetts, North Dakota, Oregon, and Utah have done so by statute. *See id.* at § 6:3. California and Missouri modified the doctrine. *See id.* at § 6:4. Arizona, Arkansas, Indiana, Iowa, Minnesota, New York, and Washington have treated assumption of risk as a type of fault to be compared in assessing comparative negligence. *See*

*id.* at § 6:5. Florida, Illinois, Louisiana, Maine, Montana, Nevada, Ohio, Pennsylvania, Texas, Vermont, and Wisconsin have abolished, merged, or treated assumption of risk as a type of fault after adopting comparative fault. *See id.* at § 6:6.

**10.** Georgia, Mississippi, Nebraska, South Dakota and Tennessee remain jurisdictions which follow contributory negligence principles. H. Woods, *supra* at § 6:8.

support of his decision that assumption of risk was not a defense in actions under the Jones Act or arising from unseaworthiness: "No American case appears to have recognized assumption of risk as a defense by such a suit." *The Arizona v. Anelich,* 298 U.S. 110, 122, 56 S.Ct. 707, 711, 80 L.Ed. 1075, *reh'g denied,* 298 U.S. 692, 56 S.Ct. 945, 80 L.Ed. 1409 (1936).[11]

11. International uniformity of rules applicable on the high seas, is an objective which admiralty seeks to achieve:

it might be preferable to look on maritime law as a system not depending for its validation on any inferred national legislation, for this view gives accent to the desirability of international uniformity.

G. Gilmore & C. Black, *The Law of Admiralty* 45 (2d ed. 1975). In particular, in the area of negligence in collisions, the decisive British role in formulating the law of the sea has been crucial to American admiralty law. *See, e.g., United States v. Reliable Transfer Co.,* 421 U.S. 397, 401–4, 95 S.Ct. 1708, 1710–12, 44 L.Ed.2d 251 (1975) (a maritime law adopted from England was changed, following the British authorities when the British law changed). It, therefore, is instructive to take a lesson from the law described by Gilbert and Sullivan as that of the monarch of the sea. That law is to be found in a leading United Kingdom decision, still cited in 43 *Halsbury's Laws of England,* para. 99 (Pleasure Yachts—Liability in Case of Collision) (4th ed. 1983), of the House of Lords *Clarke v. the Earl of Dunraven, The Satanita,* [1897] A.C. 59, 66 L.J.P. 1, 75 L.T. 337, 13 T.L.R. 58 (1896). The case was one in admiralty concerning yachts involved in a collision in the course of a race.

*The Satanita* dealt specifically with damage incurred between racing yachts which collided during a race at the Mudhook Regatta on the river Clyde. The Valkyrie, owned by the Earl of Dunraven, sank after the Satanita, not sailed by her owner, broke the eighteenth rule of the Yacht Racing Association and collided with her. The owners of the yachts had agreed to be bound by rules of the Yacht Racing Association which made the owner of the Satanita liable to Lord Dunraven for "all damages" caused by the collision to the Valkyrie, estimated at 10,0001. A.B. Clarke, the owner of the Satanita, admitted that the collision was caused by the improper navigation of the Satanita, which for the race, had a third party as its master. Despite the "all damages" language of the Yacht Racing Association's rules, he sought to rely on language in the Merchant Shipping Act, which restricted the damages recoverable where the ship's master was not the owner to limit liability to 9521. 7S. 4d. The Act limited liability for vessels, not sailed by their owner, which collided to a percentage of the tonnage. According to Sir R.T. Reid, Q.C. and E.H. Pollard who represented Clarke,

By the Merchant Shipping Act Amendment Act 1862 c. 63 s. 54 the owner of any ship— where without his actual fault or privity any loss or damage is by reason of the improper navigation of the ship caused to any other ship, goods or merchandise thereon—shall not be answerable in damages to an aggregate amount exceeding 81. per ton of the faulty ship's registered tonnage.

A.C. at 60.

After Lord Halsbury in the House of Lords had expressed his opinion that the Satanita was liable for all damages, Lord Herschell also spoke to the same effect. He named first two of the courses open to Lord Dunraven. He could sue on a negligence theory, either because "[t]he common law creates liability in the case of navigation which is negligent at common law," *id.* at 65. Or he could proceed to sue because "navigation ... is to be deemed negligent as being a breach of the statutory rule." *Id.*

Lord Herschell then went further to outline a third course in contract open to Lord Dunraven based on the observation "that the liability created by the contract is not a liability which exists at common law." *Id.* at 64. Lord Dunraven, thus, could sue on the contract "because the contract gives of course the correlative right of being entitled to all damages." *Id.* at 65. Lord Herschell continued, "Amongst these sailing rules there are rules which are a mere repetition of the ordinary navigation rules.... [The navigation rules] exist, and they would have applied as being amongst the ordinary rules of navigation, whether they had been among these sailing rules or not.... The parties have chosen for some reason or other to insert [these ordinary navigation rules] among the sailing rules by which they have become contractually bound...." *Id.* at 66. In other words, compliance with language in the racing rules was not a prerequisite to recovery in a tort action. In addition, the requirement to give way to the ship ahead was an ordinary navigation rule as well as a sailing rule of the association involved.

Lord Herschell speculated that the rationale for the contractual arrangement and suit was to ensure that the amount collected by a yacht damaged in a race would not depend on whether or not the owner of the yacht had been navigating. Thus an owner of a yacht could sue unrestrictedly for negligence on assuming the burden to prove negligence. In any event, assumption of the risk would not be present merely by virtue of the nautical sailboat race. It was not even alluded to in any of the opinions of the House of Lords.

The reasoning of the Lords in *The Satanita* is persuasive. The damage provisions of the IYRR would only apply to a contract action whereas De Sole has sued in tort for negligence. *See Meggeson v. Burns,* Mayor's and City of London Court, [1972] 1 Lloyd's Rep. 223 (recognizing that one damaged by a collision in a yacht race in navigable waters could maintain an action

Confronted neither by history nor state majority, we perceive no compelling reason to find that assumption of risk is, in general, a defense to admiralty cases involving competitive racing. The wish that sailors, especially midshipmen at the Naval Academy, whose mission in life is one of public defense, shall be men and women of iron is one we may embrace without allowing sailors engaged in a race on the high seas for the purpose of developing and demonstrating their naval skill to escape entirely free of all punishment for faulty seamanship.[12] Nevertheless, we do not need to reach the issue at this moment for the foregoing reasons and further because, if the defendant's negligence should turn out to have been gross, *i.e.*, exceeding mere or simple negligence, *see Gauvin v. Clark*, 404 Mass. 450, 537 N.E.2d 94 (1989), assumption of risk doctrine in any event would not apply.

"On an appeal from a dismissal under 12(b)(6) the accepted rule is 'that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 457 (4th Cir.1983) (*quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)); *accord Finlator v. Powers*, 902 F.2d 1158, 1160 (4th Cir.1990); *Rogers v. Jefferson–Pilot Ins. Co.*, 883 F.2d 324, 325

(4th Cir.1989). "Liberal construction in favor of the plaintiff is mandated." *Coakley*, 706 F.2d at 457.

We have held before that the failure specifically to identify the provision permitting recovery is not fatal. *See Rogers*, 883 F.2d at 325–26 (plaintiff's complaint erroneously relied on 29 U.S.C. § 1140 as the basis for the claim; court found that 29 U.S.C. § 1132(a)(1)(B) would permit recovery and reversed 12(b)(6) dismissal). "Reckless" misconduct, as has been pleaded, constitutes gross negligence. *See Prosser and Keaton on Torts, supra* at 211–14; *Churchill v. F/V Fjord*, 892 F.2d 763, 772 (9th Cir.1988), *cert. denied*, — U.S. —, 110 S.Ct. 3273, 111 L.Ed.2d 783 (1990) (collision of two skiffs).

De Sole's complaint alleged that the sailing master acted "recklessly" and "dangerously". Such words, somewhat conclusory in character, at trial might appear insufficient by themselves. Certainly the district judge appeared to allow them no consequence and the *amici curiae* and De Sole did not appear to do so either. But here we confront a 12(b)(6) motion. There was the significant allegation that, as a consequence of the collision, the sailing master in command of the CINNABAR had been removed from the role of being in charge of the vessel. Further, the complaint alleges damage to De Sole's vessel extensive enough to be consistent with gross negli-

---

for negligence, which he in fact chose to abandon, as well as advance a claim in contract under the IYRR). Hence, whether the rules spell out the quantum of damages or not is wholly irrelevant to an action in tort.

Moreover, and by no means incidentally, given the inapplicability of the British Merchant Act of 1894 to a course of action such as the one which De Sole has asserted, there is no limit to recovery of damages suffered in a yacht race on maritime waters through a tort claim based on the negligent act of a competitor. The doctrine of assumption of the risk, known in England as, *volenti non fit injuria*, simply plays no part in the ordinary sailboat race, occurring in admiralty, insofar as the majesty of the British law is concerned. That, in England, assumption of the risk could apply to landbased torts at the time is made clear by *Prosser and Keeton on Torts* § 68, at 480 (the assumption of risk "defense received its greatest impetus" from an 1837 British master and servant case and had been analyzed in a

1895 Harvard Law Review article). Simply put, negligence at sea renders the perpetrator liable.

**12.** Indeed, for a long time, every midshipman has been encouraged to commit to memory the immortal words of the Twentieth Law of the Navy and its concluding moral:

If the fairway be crowded with shipping,
Beating homeward the harbor to win,
It is meet that, lest any should suffer,
The steamers pass cautiously in.

. . . . .

As the wave rises clear of the hawsepipe,
Washes aft, and is lost in the wake,
So shall ye drop astern all unheeded,
Such time as these laws ye forsake.

Adm. R.A. Hopwood, R.N. (Ret.). The poem first appeared in *Reef Points 1920–1921* (volume 16). *Reef Points*, the Annual Handbook of the Brigade of Midshipmen, continues to be published every year.

gence or even recklessness. De Sole did argue with some vigor that he, as the person racing the CIRO, never contemplated and never anticipated that a race contestant on the high seas would ever disregard and blatantly violate so well established and universally recognized a maritime rule as the one requiring that an overtaking vessel give way to the vessel in the lead. *See* 33 U.S.C. § 2013.

■ The inclusion of a separate allegation that the *Cinnabar* was "recklessly and dangerously" maneuvered is sufficient at the 12(b)(6) stage to raise a claim for gross negligence. The mere failure to include the words "gross negligence" in the complaint does not bar such a claim at the 12(b)(6) stage when combined with the facts present in the record.

Consequently, there may well be facts which can be proven that will take the case out of the assumption of the risk posture even under the standard imposed by the district court. The case may, in a most substantial manner, mark a new departure in a huge number of maritime athletic contests occurring in a multitude of different places. It is prudent to be very slow to decide, on what in effect is a demurrer,[13]

that assumption of the risk does or does not apply to an admiralty sporting race.[14] We are loathe to countenance reaching such a decision if it is not necessary to do so. On the other hand, if it is going to prove necessary, we should not undertake to do so on anything less than a substantially complete record.

■ Whether and, if so, under what circumstances assumption of the risk applies in admiralty we again emphasize that we do not, in the present posture of the case, reach. We find that a remand is necessary to determine the presence, *vel non*, of gross negligence or recklessness.[15] In addition, on remand the court should investigate whether the risk of a collision through ignoring a universally established rule was ever contemplated and assumed by the CIRO. Only in the event of a negative answer to the first question and a positive answer to the second, will the question of whether the doctrine of assumption of the risk applies to a sailboat race on navigable waters arise. Because there is to be a remand in any event, it will afford an opportunity to flesh out the facts on which to base a decision, if the issue of assumption

**13.** Fed.R.Civ.P. 12(b)(6) is the modern day equivalent of the old commonlaw demurrer. 2A J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice* ¶ 12.07[2.–5], at 12–63 (1989).

**14.** Neither we, the parties, nor the *amici curiae* have been able to find any case, other than *Dunion*, that injects the doctrine of assumption of risk into admiralty law. That body of law is marked by a need for uniform rules. The law of the several states regarding whether, and if so to what extent, assumption of the risk is to apply is far from uniform. As the Supreme Court recently stated: "The need for uniform rules of maritime conduct *and liability* is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels, commercial or *noncommercial.*" *Sisson v. Ruby,* — U.S. —, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990) (emphasis added). Sailboat races can occur over days, even weeks, in waterways used by many other non-participant vessels, making assumption of the risk, and the underlying reasons therefore, inappropriate.

**15.** There has been no adequate examination, prior to the district court's grant of a FRCP 12(b)(6) motion without a hearing, of whether, in yacht racing physical contact between partici-

pating contestants is ever foreseen, or more especially was foreseen in the instant case by De Sole, bearing in mind that protection of the participants was the thrust of the rules rather than merely securing of the better playing of the game as a test of skill. Restatement (Second) Torts § 50. Furthermore, the unease persists that "recklessness" and "dangerousness", though pleaded, may have been presented in an intentionally scanty fashion by De Sole either (a) to try to force a broad decision not required by the facts of the case (the sailing master in command of the CINNABAR had been set down by the Naval Academy for his part in bringing about the accident causing damages of $41,600.05) or (b) to refrain from occasioning possibly dire consequences to a naval midshipman.

Such reasons would also counter the dissent's argument that the failure of the protest committee to penalize the *Cinnabar* under the discretionary IYRR Rule 75, "Gross Infringement of Rules or Misconduct," is "strong evidence" that gross negligence cannot be present. As the dissent implies in footnote 15, we should hesitate before concluding that fact finding and decisions by yacht racing committees are altogether preclusive of any questions related to disputes, especially in a maritime matter in the federal courts.

of risk in admiralty generally must be addressed. The remand extends to both aspects of the case unless resolution of the first renders it unnecessary to reach the second.

REVERSED AND REMANDED.

WIDENER, Circuit Judge, dissenting:

The majority holds that assumption of risk does not apply to the "facts as presented." I believe assumption of risk should apply to preclude recovery by one racing yacht from another when ordinary negligence is claimed. Because only ordinary negligence was pleaded, the "facts as presented" require us to say that assumption of risk should apply in this case. Therefore, I respectfully dissent.[1]

The majority remands, in part, for the district court to determine whether the Navy may have been guilty of gross negligence. But the issue of gross negligence is raised for the first time by the majority and not by the parties.[2] De Sole in his complaint could have pleaded gross negligence but chose not to. Instead, he sought "recovery of damages caused by the *negligent navigation* of the U.S. vessel" (emphasis added). He further pleaded that the master of the *Cinnabar* was relieved from duty as master by the U.S. Navy "for his *negligent* navigation" (emphasis added). De Sole's complaint alleged that the damage was

> solely brought about through the *negligence* of the United States vessel *Cinna-*

*bar* and those in charge of her, among others in the following particulars:

a. In that those in charge of her were incompetent and inattentive to their duties;

b. In that they failed to proceed with care and due regard for vessels in their vicinity;

c. In maneuvering *Cinnabar* recklessly and dangerously;

d. In permitting *Cinnabar* to go off course and into collision with *Ciro*, in violation of the U.S. Inland Rules of the Road, Rule 13, 33 U.S.C. § 2013.

(emphasis added). The majority would convert De Sole's complaint into a complaint charging gross negligence by isolating the words "recklessly and dangerously." These words, however, stand alone without any factual allegations to support a charge of gross negligence, and even the majority recognizes that these "somewhat conclusory" words "might appear insufficient by themselves." Op. at 1177. The majority further concedes that De Sole, the *amici curiae*, and the district court did not consider the words to be pleading gross negligence.[3]

The majority, therefore, has turned to other facts shown in the pleadings in the attempt to find gross negligence. It relies on the facts that: the sailing master of the *Cinnabar* had been removed from that role; that there was alleged $41,600.05 in property damage to *Ciro;* and that the rule

---

1. Yacht racing has a long and interesting history. My hope is that the invitation to litigation of this decision will not damage the sport. Yachts appeared some 5,000 years ago. See J. Rousmaniere, *The Golden Pastime: A New History of Yachting*, 1986, pg. 10. (hereinafter cited as Rousmaniere). In 1661 King Charles II of England won the first recorded yacht race over his brother, James. Rousmaniere at 17. The first yacht club, Ireland's Water Club of the Harbour of Cork, was formed in 1730. Rousmaniere at 47. Unfortunately, yacht racing has *not* been *without* an *occasional* breakdown of civility. During the 1829 King's Cup of the Royal Yacht Club race, the yachts *Lulworth* and *Louisa* intentionally collided near the finish line. The crews "went at it with an assortment of weapons." Rousmaniere at 56. The race committee eventually awarded the cup to the

*Lulworth* after deciding that the *Louisa's* crew's "use of axes in the cutting away of rigging was unjustifiable." Rousmaniere at 56.

2. De Sole alleged negligence. The Navy responded to a charge of negligence, and the district court treated the case as a case involving negligence; gross negligence was not mentioned. We are out of place, I think, in trying to read gross negligence into the complaint. In addition, I believe, as I will demonstrate, the absence of gross negligence has probably been definitively decided by the acts of the parties and the fact finding of the Race Committee.

3. Exactly, the opinion states: "Certainly the district judge appeared to allow them no consequence and the *amici curiae* and De Sole did not appear to do so either." Op. at 1177.

violated, International Yacht Racing Rule (IYRR) 37.2 [4], was so well known that violation of it may be gross negligence. However, each of those reasons for suspecting gross negligence fail.

First, De Sole himself pleaded, and we have no basis to doubt, that the sailing master was relieved from being sailing master "for his negligent navigation." It requires much straining to go beyond the clear statement of De Sole as to why the midshipman was relieved. Certainly, there are other more severe penalties which the Navy could have imposed had the young master been guilty of gross negligence or an intentional tort. But we should not have to engage in such a debate, since even the plaintiff, De Sole, attributed the sanction only to "negligent navigation."

The next fact relied upon by the majority is that the *Ciro* suffered $41,600.05 in damages.[5] But a connection between the degree of damages and the degree of fault of the parties is supported by neither logic nor precedent. That severe damages can be caused by simple negligence and nominal damages by gross negligence or even an intentional tort is at once apparent, and the attempt in the majority opinion to correlate the amount of damages with the degree of negligence has previously been rejected by this court. In *Collins v. Risner*, 269 F.2d 654, 658–659 (4th Cir.1959), cert. denied, 361 U.S. 924, 80 S.Ct. 293, 4 L.Ed.2d 240 (1959), an automobile collision, we rejected the plaintiff's contention that the "extent of the damage resulting from the collision" might, in part, be evidence "to raise the ordinary negligence of . . .

[the defendant] to the higher degree of gross negligence."

The final argument of the majority is that the rule which the Navy allegedly violated is so well known that any violation of it must be gross negligence. As noted by the court in *Ferrell v. Baxter*, 484 P.2d 250, 261–263 (Alaska 1971), violation of a traffic law [6] is treated differently from jurisdiction to jurisdiction, with the majority holding that a violation is negligence per se, but a substantial minority holding the violation is merely evidence of negligence. However, I know of no jurisdiction that equates the violation of a traffic law, without more, to gross negligence. Just because the rule is well known does not make a violation of the rule gross negligence. The mere fact that a car exceeds the posted speed limit, for example, does not without more make the driver guilty of gross negligence even though the rule is well known.

More importantly, we have held, in *Miller v. Semet–Solvay Div.*, 406 F.2d 1037, 1038 (4th Cir.1969), cert. denied, 395 U.S. 921, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969), that the violation of an almost identical rule of the nautical road involved here "spells negligence." [7] If the Navy violated the rule, it was negligent. However, the violation, by itself, cannot be considered to be gross negligence.

Finally, on this subject, I think my view of negligence was not only admitted by the parties in their pleadings, such was probably made obligatory as shown by the penalty that the Protest Committee leveled against the *Cinnabar*. The Protest Com-

---

4. IYRR 37.2 requires that "[a] yacht *clear astern* shall keep clear of a yacht *clear ahead*." (emphasis in original). It is virtually identical to the Rule 13 of the Road as found in 33 U.S.C. § 2013 that "any vessel overtaking any other shall keep out of the way of the vessel being overtaken."

5. I am not persuaded that $41,600.05 worth of damages to a racing yacht is of unusual significance. Yachts are notoriously extremely expensive as shown by J.P. Morgan's response when asked by millionaire oil man Henry Clay Pierce what it cost to run a yacht. Morgan's advice was "If you have to ask how much it costs, you can't afford it." Rousmaniere suggests that

what was meant was that the rewards of yachting always outpace the cost and that Morgan's advice was not a boast, rather a reflection of spiritual humility. Rousmaniere, p. 98. I have no comment to make, either on Morgan's advice or Rousmaniere's justification, but point out that the discussion reflects yachting's regard for money.

6. Although traffic laws and maritime rules of the road are obviously two distinct subjects, the two are similar enough to compare.

7. The rule violated was Western River Rule 22, not essentially different from the rule involved here.

mittee[8] disqualified the *Cinnabar* from the race, which is the penalty provided for in IYRR 74.4 under the "PENALTIES AND EXONERATION" section. Under IYRR 75, "GROSS INFRINGEMENT OF RULES OR MISCONDUCT," the rules provide that when a protest committee "finds that there has been a gross infringement of the rules or a gross breach of good manners or sportsmanship, it may exclude a competitor, and a yacht when appropriate, either from further participation in a series, or from the whole series, or take other disciplinary action." The fact that the Protest Committee did not penalize the *Cinnabar* or her master or the Naval Academy under IYRR 75 is strong evidence that there was no gross negligence involved here, and indeed, if we assume, as we should, that the Protest Committee did its duty, that gross negligence was not involved should be a necessary conclusion.

One undertaking on remand as ordered is to supplement the record. And one purpose apparently is to discover whether there is, as *amici* asserts, and the majority infers, "a long-standing tradition in sailboat racing that the party at fault in a collision bears the responsibility for the damages caused." Op. at 1173. Under the rules in effect at the time of the accident, and the current version of the rules, IYRR 76.1 states "[t]he question of damages arising from an infringement of any of the *rules* shall be governed by the prescriptions, if any, of the national authority" (emphasis in original). At the time of the race, the rules of the United States Yacht Racing Union (USYRU) made no provision whatsoever for damages.[9] However, this has not always been the case.[10] IYRR 72(4)[11], as late as 1968, provided that "[t]he owner of a yacht which infringes any rule shall pay all damages caused thereby." The rule was deleted by the USYRU in 1969.[12] See J.H. Feller, *Yacht Racing Protests & Appeals*, 1972, pg. 48.[13] The repeal of the very rule we are asked to impose judicially is, of course, significant. The USYRU must have intended to make a change when it repealed the rule.[14] If we

---

8. Under IYRR 1.3 and 1.4, the Race Committee may perform the function of a Protest Committee, as obviously happened here.

9. According to supplemental authority submitted by DeSole, at the USYRU's 1991 annual meeting, the Union adopted the following prescription: "USYRU prescribes that liability for such damages shall be determined in accordance with the rules and apportioned solely by comparative fault principles under general federal maritime law." The new rule has no effect on the present litigation as it was enacted subsequent to the race in question. In addition, it is unclear what effect the rule will have in the future. If, under the new prescription, the *race committee* is to assess damages then the USYRU will have achieved what I have advocated; courts will not intrude into yacht races. If, however, the new prescription is merely a statement of the law which is to be applied by *courts,* then the USYRU has changed nothing. The statement "damages shall be determined in accordance with the rules" is of no consequence since the rules do not deal with the question of damages. The further statement that liability for damages shall be "apportioned solely by comparative fault principles under general federal maritime law," except for the enigmatic reference to comparative fault, merely states what would be true in the absence of any prescription; the law in effect, general federal maritime law, will govern in a yacht racing case in which a federal court's admiralty jurisdiction is invoked.

10. It is inexplicable that the existence and the later repeal of the rule which required yachts which were found to have violated racing rules to pay for damages, was not brought to the attention of the court by the parties or the *amici.*

11. I refer to the rule as adopted by the North American Yacht Racing Union which is the earlier name of the USYRU.

12. I am unable to find anything published which explains the USYRU's decision to delete the rule. I note, however, that the yacht racing rules are different in character from the traditional rules of the road. Yacht racing rules are designed to allow for maximum maneuverability in close proximity to another yacht. A comparison of the yacht racing rules and the normal rules of navigation leaves me with the firm conclusion that there is more inherent risk of collision involved with the racing rules.

13. Feller's treatise goes on to state that "[t]he tendency of some insurance companies to press a race committee into the role of a claims adjuster should be firmly resisted." Feller at 49.

14. *Amici's* failure to disclose to the court the USYRU's repealed rule seriously undermines their credibility. In addition, *amici's* argument

require a yacht which infringes any rule to pay for damages, then we are simply re-imposing the repealed rule, amounting to a decision that, as a matter of law, the repealer is of no effect.[15] The existence of the rule up until early 1969 also explains the relatively few cases [16] involving yacht collisions during races. As noted by the court in *Salvesen v. Young*, 1966 S.L.T. (Sh.Ct.) 81 (1965), the Royal Yachting Association's (RYA) rules, which, like the old American rules required the yacht which violated the rules to pay for damages [17], provided an "expeditious and uncomplicated" procedure which could "be likened to an arbitration clause in a contract, which also has the effect of excluding the jurisdiction of the court." The rule, therefore, has resulted in few cases involving dam-ages from a yacht race reaching the courts. Given the existence and later repeal of the rule, I see no need for a remand to further consider the traditions of the sport in that regard. Far from the Corinthian traditions relied upon by the *amici* or the inference therefrom relied upon by the majority, the absence of litigation, an inspection of the authorities cited reveals, has been due to a repealed rule. So I think further inquiry is neither appropriate nor desirable.

The majority further sees a need to remand in order to determine if De Sole contemplated and assumed "the risk of a collision through ignoring a universally established rule." Op. at 1178. Again, I disagree. Assuming assumption of risk applies, then De Sole, like participants in oth-

---

that the sport will be disrupted by keeping the courts out of disputes between yachtracing participants is incredible. The position advocated by *amici* and adopted by the majority opens the doors for litigation every time a rule is alleged to have been violated in a yacht race. This, to me, seems a dangerous precedent for the future of racing.

If the *amici* believes that the party in a yacht race who violates a rule should pay for damages then it should reinstate its repealed rule. Then, damages would be paid and the sport could continue to govern itself without the interference of the courts.

Because of the ambiguous language in the new prescription enacted by the USYRU at its 1991 annual meeting, it is unclear what effect it will have. See note 9. If the USYRU intended to make a party that violates a rule pay damages it should have expressly said so. Instead, it enacted a prescription which appears to have no effect, except for the enigmatic reference to comparative fault, other than to restate the law.

**15.** This we should not do. If we are to allow this sport to continue to govern conduct between its own participants, we must not be tempted to look to custom to reinstate a rule which was expressly and purposefully taken out by the USYRU. If the USYRU believes it appropriate to reinstate the earlier rule on damages, it should do so and not turn to the courts for help it should provide for itself.

I note that, according to supplemental authority submitted by DeSole, at the USYRU's 1991 annual meeting, the Union adopted the following prescription: "USYRU prescribes that liability for such damages shall be determined in accordance with the rules and apportioned solely by comparative fault principles under general federal maritime law." The ambiguity of this language makes its effect uncertain. See note 9.

**16.** *Amici* argues that it is "highly significant" that "in [yacht racing's] long history this sport has not produced one reported decision involving a collision between two boats." The following cases were overlooked.

*Kayfetz v. Walker*, 404 F.Supp. 75 (D.Conn. 1975), which involved a collision between the yachts *Pegasus* and *Wildcat* during a race conducted by the Larchmont Yacht Club of New York.
*Salvesen v. Young*, 1966 S.L.T. (Sh.Ct.) 81 (1965), which involved a collision of the yachts *Namhara* and *Tinto* during a race organized by the Loch Long Sailing Club.
*Meggeson v. Burns*, 1 Lloyds Rep 223 (1972), which involved a collision of the yachts *Samantha* and *Suzalah* during a race organized by the Royal Southern Yacht Club.
*Clark v. Earl of Dunraven*, (1897) A.C. 59, which involved a collision of the yachts *Satanita* and *Valkyrie* during a race organized by the Mudhook Yacht Club.

**17.** Both the RYA rules and the USYRU rules at the time of *Salvesen* required the yacht which violated the rules to pay for damages. The current RYA rules "prescribe that: 1. No claim for damages arising from an infringement of any of these rules or the sailing instructions shall be adjudicated upon by any race committee or appeal authority, but shall be subject to the jurisdiction of the Courts." IYRR 76.1 for 1989–1992, as adopted by the RYA. Just as interesting is RYA prescription 3 under Rule 76.1: "The finding of fact and decision of protest committees shall be relevant only to the purposes of IYRU Yacht Racing Rules and shall not be referred to in any proceedings for damages without the written consent of all parties to the protest." So the Royal Yacht Association has come to the opposite conclusion than the majority seeks here.

er sports, assumed the risks that were "obvious and foreseeable." *Novak v. Lamar Ins. Co.*, 488 So.2d 739, 740 (La.App.1986) cert. denied 491 So.2d 23 (La.1986).[18] Certainly, it is obvious and foreseeable that racing rules will be violated. The USYRU has developed an organized procedure including rules, protests and appeals to handle situations when there is a claim the racing rules are violated. Neither can it be said that it is not obvious and foreseeable that yachts in a race will, from time to time, collide. The very existence of rules, past and present, regarding payment for damages, is proof certain that participants in the sport are aware of such risks. Yacht racing is not without very real dangers.[19] See Sutterfield, *Personal Injury and Death Aboard Racing Yachts*, Journal of Maritime Law and Commerce, Vol. 12 No. 2, Jan. 1981. De Sole is bound to have understood the danger of collision as well as such other risks when he entered the race. Even if it is true that by participating in a sport, one does not expect a fellow participant to intentionally violate a safety rule or to be grossly negligent, such an intentional violation or gross negligence is not a part of this case. This case deals with, in the words of the complaint, "the negligent navigation of the U.S. vessel." There is simply no need to remand.

This brings me to the primary question on appeal: Whether assumption of risk applies to preclude recovery in this case? [20] I believe it does and would affirm the district court.

Assumption of risk has long been applied in cases involving competitive sports. The court in *Ross v. Clouser*, 637 S.W.2d 11 (Mo.1982), summarized one motivation for courts to apply the doctrine in sports cases. "Fear of civil liability stemming from negligent acts occurring in an athletic event could curtail the proper fervor with which the game should be played and discourage individual participation." *Ross*, 637 S.W.2d at 14. The doctrine has been applied to many different types of athletic events and sporting situations. See *Novak v. Lamar Ins. Co.*, 488 So.2d 739 (La.App.1986), cert. denied, 491 So.2d 23 (La.1986) (softball); *Kuehner v. Green*, 436 So.2d 78 (Fla.1983) (karate); *Nesbitt v. Bethesda Country Club, Inc.*, 20 Md.App. 226, 314 A.2d 738 (1974) (golf); *Kabella v. Bouschelle*, 100 N.M. 461, 672 P.2d 290 (App.1983) (football); *Heldman v. Uniroyal, Inc.*, 53 Ohio App.2d 21, 371 N.E.2d 557 (1977) (tennis); *Oswald v. Township High School Dist.*, 84 Ill.App.3d 723, 40 Ill.Dec. 456, 406 N.E.2d 157 (1980) (basketball); *Hanson v. Kynast*, 38 Ohio App.3d 58, 526 N.E.2d 327 (1987) (lacrosse); *Maddox v. City of New York*, 66 N.Y.2d 270, 496 N.Y.S.2d 726 (1985) (baseball); *Gauvin v. Clark*, 404 Mass. 450, 537 N.E.2d 94 (1989) (hockey); *Ford v. Gouin*, 227 Cal.App.3d 1175, 266 Cal.Rptr. 870 (1990), review granted, 269 Cal.Rptr. 720, 791 P.2d 290 (1990) (waterskiing); *Ramos v. City of Countryside*, 137 Ill.App.3d 1028, 92 Ill.Dec. 607, 485 N.E.2d 418 (1985) (bombardment, played with a softball).

The doctrine is very appropriate in the context of competitive racing. See *Gehling v. St. George's Univ. School of Medicine, Ltd.*, 705 F.Supp. 761, 766–767 (E.D.N.Y.1989) affirmed by 891 F.2d 277 (2d Cir.1989) (table) (foot racing); *Knowles v. Roberts–At–The–Beach Co.*, 115 Cal. App.2d 196, 251 P.2d 389 (1953) (hobbyhorse racing); *Clark v. State*, 195 Misc.

---

**18.** The Louisiana Supreme Court has since held that because the legislature had adopted comparative fault, "courts, lawyers, and litigants would best be served by no longer utilizing the term assumption of risk...." However, the court went on to state that its decision did not mean "that the result reached in ... common law's 'implied primary' assumption of risk cases was incorrect." *Murray v. Ramada Inns, Inc.*, 521 So.2d 1123, 1134 (La.1988).

**19.** Racing is today probably not as dangerous as the sport engaged in by yachtsmen of the late 1600's, who engaged in mock battles with their yachts. Rousmaniere at 14–15. Nor may it be as dangerous as King Charles II's habit of naming his yachts for his paramours. To be fair to King Charles, he also named two yachts for his wife, Catherine. Rousmaniere at 16–17.

**20.** The majority opinion, while expressly not reaching the issue of whether assumption of risk should apply, op. at 1176, in admitted dictum indicates that "the majority would be disposed to hold that there is ordinarily no assumption of risk doctrine applicable to collisions between contestants in a maritime race of the nature here presented." Op. at 1174.

581, 89 N.Y.S.2d 132, 139 (Ct.Cl.1949) affirmed by 276 A.D. 10, 93 N.Y.S.2d 28 (1949) (bobsled racing); *Santiago v. Clark,* 444 F.Supp. 1077 (N.D.W.Va.1978) (horse racing); *Provence v. Doolin,* 91 Ill.App.3d 271, 46 Ill.Dec. 733, 414 N.E.2d 786, 795 (1980) (auto racing); *Mayer v. Howard,* 220 Neb. 328, 370 N.W.2d 93 (1985) (motorcycle racing); *Dunion v. Kaiser,* 124 F.Supp. 41 (E.D.Pa.1954) (motorboat racing)[21]; *Pressler v. Peter U,* 1990 WL 161974, 1990 Ohio App. LEXIS 4617 (Ohio Ct.App.1990) (yacht racing).

Although we have noted "the general inapplicability of the assumption of the risk doctrine in maritime law", see *McCoy v. United States,* 689 F.2d 1196, 1198 (4th Cir.1982), I am of opinion that this is *not* a case of "general inapplicability"[22] and that the doctrine should apply in the context of a yacht race.[23] A yacht race, in most respects, is like any other competitive race. Given that the doctrine of assumption of risk is especially appropriate in the competitive sports context, I believe that it should apply here.[24]

**21.** This admiralty case was relied upon by the district court but is rejected by the majority.

**22.** *McCoy* was a case of the claim of a seaman injured in slip and fall accidents on board ship. These claims, I suggest, have no relation to a collision in a yacht race.

**23.** The majority gives great weight to the fact that assumption of risk was not alluded to in *Clarke v. Earl of Dunraven,* (1897) A.C. 59. Op. at 1176, n. 11. Assumption of risk had no place in that lawsuit because it was an action for breach of contract. Clarke, the party who violated the rules, was contractually bound, by the sailing rules of the Yacht Club Association, to "pay all damages" caused by the violation." (1897) A.C. at 59–60. Assumption of risk would not bar a suit brought on the contract. Clarke argued that the Merchant Shipping Act Amendment Act's limitation of liability was not overridden by the contractual obligation to "pay all damages" and therefore he should be required to pay only the statutory amount of damages. The court appropriately held that Clarke was contractually bound to pay all damages.

The majority incorrectly asserts that the yacht racing rule then in effect allowed "an owner of a yacht [to] sue unrestrictedly for *negligence.*" Op. at 1176–77, n. 11 (emphasis added). Rather, an owner could sue unrestrictedly for *breach of contract* if a party failed to pay for damages he

I am not dissuaded by the fact that much admiralty law is based on comparative negligence. Many comparative negligence jurisdictions have continued to apply assumption of risk principles. Florida, for example, adopted a comparative fault system in *Hoffman v. Jones,* 280 So.2d 431 (Fla. 1973). Yet in *Kuehner v. Green,* 436 So.2d 78 (Fla.1983), it applied assumption of risk to prevent recovery for injuries which occurred while participating in karate. Similarly, the Supreme Court of Rhode Island concluded that the adoption of comparative negligence "neither diminishes the validity of assumption of the risk as a defense to negligence actions nor makes it a mere mitigating factor in assessing liability." *Kennedy v. Providence Hockey Club, Inc.,* 119 R.I. 70, 376 A.2d 329, 332 (1977). Massachusetts, likewise a comparative fault jurisdiction, applied assumption of risk principles to prevent recovery for an injury that occurred in a hockey game. The court noted

[s]ome jurisdictions explain the limitation on liability in sports competitions to

caused while violating the racing rules. Had the parties in the present lawsuit contractually agreed to pay damages, then De Sole, like the Earl of Dunraven, could have sued for damages for breach of contract and assumption of risk would have no place in the lawsuit.

Lord Halsbury's statements that "the case of yachts is different from that of merchant vessels," and "the conditions under which merchant ships sail and yachts sail are different," (1897) A.C. at 62, are good evidence that he believed that a rule of general maritime law may not be appropriate in the context of a yacht race.

**24.** The majority's statement that assumption of risk is inappropriate because sailboat races can occur in waterways used by many other nonparticipant vessels, op. at 1178, n. 14, implies that invoking assumption of risk in the present case would bar future suits by non-participants damaged by participants. This implication indicates a misunderstanding of my position. I would hold that assumption of risk should apply to preclude recovery by *one racing yacht from another yacht in the race* when ordinary negligence is claimed. The situation certainly would be different when the injured party was not a participant in the race. Cf. *Clark v. Thayer,* 14 A.D. 510, 43 N.Y.S. 897 (1897) (collision between participant in yacht race and non-participant after the participant had crossed the finish line).

cases of reckless conduct in terms of the doctrine of assumption of the risk ... (citations deleted). The Legislature has abolished the defense of assumption of the risk in Massachusetts, however. G.L. c. 231, § 85 (1986 ed.) Because the doctrine has been abolished, "the focus of the analysis in [sports cases] has shifted entirely to the defendant's duty...." *Gauvin*, 537 N.E.2d at 97 n. 5. Although Massachusetts refrained from calling its doctrine assumption of risk, the result and most of the analysis is the same. New York, in a case involving a jockey injured when a fellow jockey violated a racing rule, applied much the same analysis. *Turcotte v. Fell*, 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964 (1986). The court stated:

> [t]raditionally, the participant's conduct was conveniently analyzed in terms of the defensive doctrine of assumption of risk. With the enactment of the comparative negligence statute, however, assumption of risk is no longer an absolute defense ... (citation deleted). Thus, it has become necessary, and quite proper, when measuring a defendant's duty to a plaintiff to consider the risks assumed by the plaintiff.

*Turcotte*, 502 N.E.2d at 967. The court treated the jockey's participation as a complete bar to recovery, reasoning that his coparticipants owed him no duty to refrain from negligence. *Turcotte*, at 968.[25] The mere fact that admiralty law applies comparative fault principles, and not assumption of risk, in the context of injuries to a seaman in a seaman's case as mentioned, should not prevent the doctrine of assumption of risk from applying in the context of a yacht race.

The majority's application of Jones Act cases to the present action is of little or no value. This litigation involves a race, not a statutory cause of action on behalf of an injured employee. As I have shown, the general rule in racing of any kind, is that

assumption of risk applies. I see no reason to depart from that rule merely because this race took place on Chesapeake Bay instead of at the Charlotte Motor Speedway or Churchill Downs.

I also must note that the majority has written over ten pages of admitted dicta on the issue of assumption of risk.[26] It is of interest that while the majority is "loathe to countenance reaching ... a decision" on whether assumption of risk applies to yacht racing it nevertheless discusses at length the very issue that it holds should not be decided by this court at this time.

Finally, I believe there has hardly ever been a race of any kind involving either vessels or vehicles in which one of them has not suffered injury due to the claimed action of another in such a context that it is arguable that the operator of one or the other of the vessels or vehicles was negligent. The opinion of the majority in this case permitting the prosecution of a claim for ordinary negligence is not only contrary to the principle of universal application that one participant in a race cannot recover from another participant for mere negligence, it does a disservice to the sport by permitting the intervention of the courts of admiralty for every stay or other bit of rigging broken during a race which can be blamed on another participant, and it is an invitation to every racer in this circuit to avail himself of the courts of the United States for damages occurring during a race due only to the negligence of another participant.

Being of opinion that the doctrine of assumption of risk should apply in this case, I would affirm the judgment of the district court.

Accordingly, I respectfully dissent.

---

**25.** But see *Rutter v. Northeastern Beaver County School Dist.*, 496 Pa. 590, 437 A.2d 1198 (Pa. 1981), especially 437 A.2d at 1210, n. 6.

**26.** For dicta, see, e.g., op. at 1172–77. For admission of dicta, see, e.g., op. at 1178–79. ("Whether and, if so, under what circumstances

assumption of the risk applies in admiralty we again emphasize that we do not, in the present posture of the case, reach.")

The discussion of the issue germane to the court's actual holding can be found on the last six pages of the opinion. See op. at 1178–79.